UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------------ x
                               :
   UNITED STATES OF AMERICA,    :
                   Plaintiff,  :    Criminal No.
                               :    3:16-CR-00227 (VLB)
            vs.                :
                               :    September 13, 2017
   NICHOLAS MURPHY,             :
                   Defendant.  :
                               :
------------------------------ x
```

Federal Building
450 Main Street
Hartford, Connecticut

<u>SENTENCING HEARING</u>

(Transcription from Electronic Recording)

Held Before:

THE HON. VANESSA L. BRYANT
United States District Judge

Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258
www.falzaranocourtreporters.com

A P P E A R A N C E S:

    For the Plaintiff:

        OFFICE OF THE UNITED STATES ATTORNEY
        450 Main Street - Room 328
        Hartford, Connecticut 06103
        860-947-1101
            BY:  NANCY V. GIFFORD, ESQ.
                Assistant U.S. Attorney

    For the Defendant:

        PATTIS & SMITH, LLC
        383 Orange Street - First Floor
        New Haven, Connecticut  06511
            BY:  DANIEL M. ERWIN, ESQ.

1          (Proceedings commenced at 1:01 p.m.)

2

3          THE COURT:  Good afternoon.  Please be

4     seated.

5          And may we have the appearances of the

6     parties beginning with the Government,

7     please?

8          MS GIFFORD:  Thank you, your Honor.

9     Good afternoon.  This is Nancy Gifford on

10    behalf of the United States and with me at

11    counsel table is Special Agent Amy Noto, N-

12    O-T-O, of the FBI.

13         THE COURT:  Thank you.

14         MR. ERWIN:  Good afternoon, your Honor.

15    Dan Erwin for the Defendant, Nicholas

16    Murphy, who is with me at counsel table.

17         THE COURT:  Thank you.  Please be

18    seated.  And you'll note there's a

19    microphone there on the table; if you would

20    adjust it so that you're speaking directly

21    into it, I think you'll get a better record

22    today.

23         MR. ERWIN:  Certainly.

24         THE COURT:  And good afternoon, Mr.

25    Murphy.

1    THE DEFENDANT:  Good afternoon.

2    THE COURT:  You pled guilty to Count 1

3    of an indictment charging you with travel

4    with the intent to engage in illegal sexual

5    activity with a minor in violation of 18

6    United States Code Section 2423(b) and

7    841(b)(1)(c).  Is that correct?

8    THE DEFENDANT:  Yes, ma'am.

9    THE COURT:  And at the time you entered

10   your guilty plea did the Court order the

11   Probation Office to conduct a presentence

12   investigation?

13   THE DEFENDANT:  Yes.

14   THE COURT:  And were you advised that

15   you would be interviewed as part of that

16   investigation?

17   THE DEFENDANT:  Yes.

18   THE COURT:  Were you also advised to

19   have your counsel present with you during

20   your interview?

21   THE DEFENDANT:  Yes.

22   THE COURT:  Were you interviewed by

23   Probation?

24   THE DEFENDANT:  Yes, I was.

25   THE COURT:  Was your counsel present

1        with you?

2              THE DEFENDANT:  Yes, he was.

3              THE COURT:  Have you had an opportunity

4        to read the final presentence report?

5              THE DEFENDANT:  Yes, ma'am.

6              THE COURT:  Do you have any objections

7        to any of the facts stated in the final

8        presentence report?

9              THE DEFENDANT:  No, ma'am.

10             THE COURT:  Does either counsel have

11       any objection to any of the facts stated in

12       the final presentence report?

13             MS. GIFFORD:  None from the Government,

14       your Honor.

15             MR. ERWIN:  None from the Defense, your

16       Honor, other than I'm sure you've read our

17       memos and we have some issues of

18       interpretation, but we don't have any

19       objection to the facts as written.

20             THE COURT:  Then the Court adopts the

21       facts as stated in the presentence report as

22       its findings of fact.

23             Mr. Murphy, Attorney Erwin, I'm going

24       to allow the Government to make its

25       presentation first, after which I will hear

1          from the Defense.

2                    MS. GIFFORD:  Thank you, your Honor.

3                    THE COURT:  You're welcome.

4                    MS. GIFFORD:  Is it okay if I approach

5          the podium?

6                    THE COURT:  Yes.  Yes, you may.

7                    MS. GIFFORD:  So your Honor, I guess

8          contrary to what Defense counsel represented

9          in their reply memorandum, the Government

10         does not believe that all defendants who are

11         charged with crimes against children are

12         daring malevolent monsters.  And that is not

13         how the Government would characterize the

14         Defendant in this case.

15                   What I would say, your Honor, is that

16         this is a crime of opportunity.  The

17         Defendant was a 25-year-old man who served

18         his country in the Air Force in leadership

19         positions and he found himself in the

20         presence of a vulnerable 14-year-old girl,

21         and he used this opportunity selfishly and

22         criminally.  He simply didn't do the right

23         thing.  And whether he believed her to be 16

24         or 14 is irrelevant to the offense he stands

25         convicted of.  And as we detailed in our

1      brief we do believe he had reason to suspect

2      she was younger than 16.

3           But regardless, the facts in this case

4      and what's important in this case is that

5      this offense was not an impulsive, spur of

6      the moment act.  The first time the

7      Defendant and the minor victim met she told

8      him that she was not 19 and she stated

9      instead that she was 16.  And using good

10     judgment the Defendant left without having

11     any sexual contact with the minor.  But

12     instead of doing the honorable thing from

13     that point forward, instead of using his

14     judgment, he crossed state lines on two more

15     occasions, and on at least one of those

16     occasions he went right to the minor

17     victim's bedroom window and helped her sneak

18     out of her home while her younger sister was

19     present.  And on both of those occasions he

20     had sex with a minor inside his truck in a

21     park.

22         And his actions devastated a family.

23     When I read the victim impact statements

24     submitted by the minor victim's mother, your

25     Honor, I was struck by the impact that his

1    actions had on the family, and I was just

2    hoping to take a couple minutes to read a

3    few excerpts from that.

4         THE COURT:  Certainly.

5         MS. GIFFORD:  In that statement the

6    minor victim's mother says, "How has all

7    this affected the six people that live in

8    our home?  My first thought was this man

9    knows how to use a gun.  I questioned my

10   daughter and she shared that she told Mr.

11   Murphy all about our family, meaning where

12   our rooms were in the house, where our

13   oldest son worked.  He saw our youngest

14   daughter not once, but twice.  He's been to

15   our home not once, but twice.  He's aware

16   what dogs we have and how many we have.  He

17   knows so much about us, yet we know so

18   little.  And what we are aware of is

19   frightening.

20        "The street we live on is very dark and

21   that left me paranoid as I thought about

22   when we walked our dogs at night or when we

23   would have bonfires in our yard.  And every

24   time an unfamiliar car drove by I wondered,

25   is that him?  Late at night if I heard a

strange noise I feared, is he coming after
us?

"My husband and I have taught our
children to respect law enforcers and
military personnel.  We have several members
of our family and friends that have served
our country and we are proud of their
commitment and sacrifices.  Learning the age
of Mr. Murphy and his job, I felt betrayed,
and his actions has left our children
questioning other military personnel.

"I question what made Mr. Murphy leave
his home in Rhode Island, travel to
Connecticut, drive to my neighborhood,
approach my home and specifically our
daughter's window.  How about when he saw my
youngest daughter lying in her bed?  Did he
wonder if she might have nightmares about
him or fear that he might hurt her sister?
Did he ever stop to think this was not
right?  Did he ever wonder about any medical
issues that any of the occupants of the home
may suffer from, or how about the weeks,
months and years that will follow this
ordeal and what it might do to the family?

1          "We are approaching two years and the

2          thought that this case is coming to an end

3          is bittersweet.  I can't help but think of

4          all the lives affected by Mr. Murphy's

5          selfish actions.  Regardless of my

6          daughter's actions, she was unable to get to

7          Mr. Murphy.  He was in complete control of

8          this awful ordeal.  He was the adult in this

9          situation.  He had the resources to follow

10         through with this process or end it and

11         protect the lives he swore to when he

12         entered the Air Force."

13        So with that, your Honor, I'd ask you

14         that given the nature and circumstances of

15         the offense, the seriousness of the offense,

16         to promote respect to for the law and

17         general deterrence, a sentence within the

18         guideline range is appropriate.

19        I'm happy to answer any questions that

20         the Court has at this point but that would

21         be the bulk of the Government's position.

22        THE COURT:  Does the Government have

23         any evidence that would suggest that the

24         victim's younger daughter saw Mr. Murphy?

25        MS. GIFFORD:  The evidence we have from

1          that, your Honor, comes from the minor

2          victim's mother who states that she has

3          spoken with her daughter, that her daughter

4          has been fearful about military personnel

5          having -- because she after the incident

6          learned that the Defendant was in the

7          military and during the incident saw her --

8          mom says twice, but my information is that

9          it was one time that she actually saw him at

10         the window.  And that information comes from

11         the minor victim herself in the interviews

12         that were conducted with her after the

13         incident; that the first time he came he

14         came to the window, and the second time she

15         met him in the park because she was afraid

16         if he came to the window the dogs would

17         alert her family.

18              THE COURT:  Thank you.

19              MS. GIFFORD:  Thank you, your Honor.

20              THE COURT:  Mr. Erwin?

21              MR. ERWIN:  Thank you, your Honor.

22              THE COURT:  You're welcome.

23              MR. ERWIN:  I don't know what your

24         preference is.  Last time I was in front of

25         you I just spoke from counsel table.

1          THE COURT:  Wherever you're

2     comfortable.

3          MR. ERWIN:  Thank you.  I'll stand next

4     to my client.

5          The filings in this case I think were

6     voluminous, so I hope not to be repetitive,

7     but I'd like to begin because I think

8     properly categorizing this offense is

9     essential to -- I haven't offered any

10    theories of innocence and he pled guilty and

11    we're not disclaiming that, but I think it

12    is relevant to mitigation versus

13    aggravation.

14         I more or less agree with the

15    Government's characterization of the offense

16    in terms of it being a crime of opportunity,

17    which I think is distinct from a number of

18    the cases in the case law, and certainly

19    what many of us envision when we think of

20    these crimes.  We picture someone, usually

21    male, who goes to a place where minors or

22    younger congregate and essentially looks for

23    trouble.

24         This is someone who set out with a

25    legitimate purpose doing something that's

1     entirely normal these days and found himself

2     in a set of circumstances that were as we

3     all know not proper.  It was then that he

4     made the incorrect decision.  In other words

5     --

6          THE COURT:  I don't understand what you

7     mean, found himself and the distinction.

8     What kind of website was this?  I'm not sure

9     that I understand the distinction you're

10    making about people going to places where

11    young children congregate.  Not that that's

12    ever been my experience; I've never had a

13    case like that.  But be that as it may --

14         MR. ERWIN:  Certainly in the case law

15    that I've cited in my brief, including I

16    believe it was the *Bran* case, the *Hahn* case,

17    the *Hockins* (phonetic) case, those

18    defendants were found in -- were visiting

19    chatrooms with sexually explicit names and

20    names that indicated illegal conduct, things

21    like iloveminors.com, stuff of that nature.

22         Plenty of Fish is a website where

23    adults go to meet looking for companionship

24    and there are numerous legitimate

25    relationships that have arisen out of the

1    connections that are made on that website.

2    That's where this appeared to be based on

3    the online conversation.

4         THE COURT:  Are there any restrictions

5    or criteria for being on that website that

6    would validate the age of those on the

7    website?

8         MR. ERWIN:  I don't know, and I guess

9    that -- I mean I'm just trying to think

10   through user agreements.  I tend to think

11   that most online services we sign up for

12   have user agreements.  I frankly doubt that

13   many people view them closely.  I will say

14   that I think that from -- I did some reading

15   on the sort of online dating industry with

16   respect to this case, and the business model

17   that they use is that Plenty of Fish and

18   Okcupid are free sites.  There's no fee, and

19   the idea is that people get their feet wet

20   there and then they move onto something like

21   Match.com where they pay a fee and they're

22   more looking for a spouse.

23        But nonetheless --

24        THE COURT:  So in other words, this is

25   a website where there is no reason to assume

1        that anyone on that website is over the age

2        of majority because there are no screening

3        processes to restrict who may be on the

4        website.  They don't require a credit card

5        or any other kind of identifying information

6        that would provide a measure of assurance

7        that those on the website are not minors.

8               MR. ERWIN:  That's correct.

9               THE COURT:  Okay.

10              MR. ERWIN:  To the best of my

11       knowledge.

12              THE COURT:  Um-hum.

13              MR. ERWIN:  That said, he developed a

14       relationship online with someone who at that

15       point had represented herself to be 19 and

16       they met at a park for a walk.  At that

17       point she said that she was 16.

18              You know, the law is about drawing

19       lines in difficult circumstances, and that's

20       about where I begin to draw the line in this

21       case.  It is certainly statutory rape which

22       is at I think the core of this case.  It

23       doesn't matter whether you know the age of

24       the younger person or not.  You have a duty

25       I think to inquire or if you can't find

1    satisfactory answers then you have a duty to

2    walk away.  That's how you protect yourself

3    from committing that crime.

4         THE COURT:  But knowing that she was 16

5    that would have constituted statutory rape,

6    would it not, given that he was what, 25 at

7    the time?

8         MR. ERWIN:  Yeah.  In the federal

9    system I believe it would have.  In the

10   state system it would not have.  Mistake of

11   fact is not a defense and, look, that's not

12   a road that I'm really trying to go too far

13   down because --

14        THE COURT:  So under state law the

15   female can be 16 and the male can be 25?

16        MR. ERWIN:  I believe that's the case.

17   I mean --

18        THE COURT:  There isn't an age spread

19   at that age or is the break point at 15?

20   Whether it was --

21        MR. ERWIN:  The break point is 16.

22        THE COURT:  So it's 16 and above?

23        MR. ERWIN:  Yes.

24        THE COURT:  I thought the date rape

25   covered a 16-year-old female if the male was

1          two years older.

2                  MR. ERWIN:  Well --

3                  THE COURT:  But be that as it may.

4          Anyway, go ahead.

5                  MR. ERWIN:  There's some authority for

6          that.  I'd review that as it may.

7                  With that said, even if it was legal,

8          look, we're not even pretending that a

9          relationship between a 25-year-old and 16-

10         year-old is entirely appropriate, and I

11         think my client's come to realize that.

12         He's embarrassed that he ever even proceeded

13         under those assumptions.  But nonetheless it

14         was represented to him as legal, as

15         something that was legal, but there were a

16         number of red flags.  The fact that, you

17         know, she was coming from her parents'

18         house, that got -- I don't think she could

19         drive; the fact that she was clearly

20         changing her age that would -- I think a

21         reasonable adult should have inquired

22         further --

23                 THE COURT:  But she was sneaking out of

24         the house.

25                 MR. ERWIN:  I agree with you 100

1          percent about that.

2              THE COURT:  Wouldn't that be indicative

3          of the inappropriateness of the conduct?

4          Why doesn't the gentleman ring the doorbell,

5          introduce himself and take her out a girl

6          out on a date?

7              MR. ERWIN:  We're not pretending

8          there's anything chivalrous about this case.

9              THE COURT:  But are you contending that

10         he didn't know that she was too young to

11         have a relationship with him?

12             MR. ERWIN:  I'm contending that at a

13         minimum that was the point at which he

14         should have known that she was too young.

15             THE COURT:  And when did he see her

16         Facebook page?

17             MR. ERWIN:  It's not entirely clear.

18         In the PSI it says that they began

19         communicating on Plenty of Fish and then

20         switched over to Facebook.  I'm under the

21         impression that there were several -- the

22         bulk of the communication occurred via

23         Facebook Messenger, and Mr. Murphy is going

24         to speak and he will probably elucidate that

25         point a little bit further.

1          THE COURT:  And didn't her Facebook

2     profile have her age, and didn't she also

3     make statements on the profile about being

4     in the 9th grade, being 13?

5          MR. ERWIN:  The PSI indicates that her

6     age was on her Facebook Profile.  However,

7     the way Facebook has been organized for the

8     past several years is that when you log in

9     the main page you go to is what's called a

10    feed, and news articles, people's thoughts,

11    you know, the content of the internet is

12    posted there.  It would require going to a

13    person's actual profile and then clicking

14    onto to the about me section which has been

15    something of an antiquated move I think for

16    several years given the changing formats of

17    Facebook.

18         THE COURT:  So a grown man meeting

19    someone on the internet would likely not

20    check the profile of a young person with

21    whom he was considering having an intimate

22    relationship with or had commenced an

23    intimate relationship with?  Say after she

24    snuck out of the house the first time?

25         MR. ERWIN:  Our position is he should

1       have discontinued the relationship as soon

2       as he knew she was sneaking out of the

3       house.  There are a number of red flags

4       here.

5              THE COURT:  But if he didn't -- you're

6       saying that modern convention is not that a

7       person would check the Facebook profile?

8              MR. ERWIN:  I don't think that it is.

9              THE COURT:  Okay.

10             MR. ERWIN:  Reasonable minds can

11      disagree but I just -- I know a lot of

12      Facebook users and that doesn't seem to be

13      something that interests people on Facebook.

14             THE COURT:  Well, you have a lot more

15      experience than I do.  I've never been on

16      Facebook, believe it or not.

17             MR. ERWIN:  I didn't want to cast

18      aspersions.

19             THE COURT:  (Laughter.)

20             MR. ERWIN:  Forgive me, I lost my train

21      of thought.

22             THE COURT:  I'm sorry.

23             MR. ERWIN:  But that's -- the reason I

24      was trying to categorize this case is

25      because, look, my client is definitely

1    guilty and he has acknowledged that.  We're

2    simply distinguishing between someone who

3    wakes up in the morning and looks for this

4    kind of trouble and somebody that goes down

5    a road, learns something that should have

6    clearly told him to turn off that road and

7    nonetheless progressed.  So I think that's

8    where the crime occurred.

9         But I think the mental state, not that

10   it's relevant to guilt or innocence, but

11   through mitigation is recklessness or

12   negligence; again not somebody who is acting

13   with the vicious will to commit a crime.

14   That's my point in characterizing these

15   cases.

16        With respect to characteristics of my

17   client, I think the question that

18   preoccupies, that interests any of us in

19   these cases is why someone would do

20   something like this.  And I'm not entirely

21   sure but there are two theories and I think

22   it's my job, my obligation to share both of

23   them with you.

24        One is that -- the obvious one, the

25   world is filled with people who act on

1        libidinal interest, throw caution to the

2        wind and whatever, responsibilities they

3        have to other people to the wind and simply

4        do stupid things.  This could be that and I

5        don't deny it.

6            The other thing is I found it

7        interesting to the more sympathetic theory,

8        is I found interesting in the PSI, Probation

9        suggested moral reconation therapy, and

10       frankly I never heard of that before.  But

11       what I have learned from my client and tried

12       to get in front of you, I think

13       unsuccessfully thus far, is the

14       circumstances in which he was brought up

15       were not nearly as bad as many people who

16       find themselves in front of this court, but

17       as you know he lost his mother at a

18       formative age.  It was of interest for me to

19       learn that he spent six to eight weeks in

20       grief therapy over that and then moved on to

21       his father.

22           His father is here today.  He's clearly

23       a loving man but he's exceptionally taciturn

24       and stoic about things.  And then he went

25       into the military.  I think that part of

1          what led to his crime is crimes of this

2          nature require I think a certain emotional

3          dimension to realize what is wrong in these

4          circumstances, and my client lacked that.

5          And to the extent that he wasn't just doing

6          stupid things in search of love, I think

7          that a legitimate rehabilitative act would

8          be that moral reconation period, therapy,

9          because it goes to the sort of his one-

10         dimensional kind of emotional nature that I

11         think you'll see when he speaks.

12             I also ask the Court in my sentencing

13         memo to consider the additional state

14         punishment that's unfolding in this case or

15         that came before the federal prosecution.

16         We're well aware that a person has dual

17         duties as a citizen of both the country and

18         the state in which he lives or happens to

19         occupy for a certain period of time, but

20         it's also the case that the sentence has to

21         be reasonable under *Booker*.  And what we

22         pointed out is the really egregious part

23         here is the act with the young woman.  And

24         the State of Connecticut has found that a 9-

25         month sentence was appropriate with that.

1          Now, I know that there is federal

2     jurisdiction through the instruments of

3     commerce and people ought not to be using

4     commerce for illegitimate means or for

5     criminal means.  But this was two towns that

6     were exceptionally close to one another and

7     this was not like the other cases where

8     someone traveled from like Maryland or

9     Virginia to Florida in search of something.

10    It was not chivalrous, but it was kind of

11    like a local date in that sense, and I ask

12    the Court to take note of that.

13         One last miscellaneous thing.  I did

14    notice in the victim's statement or the

15    mother's statement that it contended that

16    Mr. Murphy went to the window and saw the

17    sister there as well.  That was I think the

18    first that I had really of it to that

19    extreme in the discovery.  I asked my client

20    about that.  His position I think is

21    consistent with what the Government said.

22    The first time I believe they met in a park.

23    The second time he did go to the window.  He

24    doesn't recall seeing someone on the other

25    side of it with the exception of the young

woman coming out.  We concede that that's a
bad fact.

And then the second time they met in
the offense for which he pled, the young
woman came across the yard.  I don't pretend
that that looks good.

Finally, I'd just ask the Court to take
note of the case law that we noted in the
brief.  I know what the guideline numbers
are in this case, but there are a
substantial number of defendants who have
gone to trial, have never acknowledged their
wrongdoing, and it certainly appears were
looking to do wrong judging by what unfolded
in those cases.  And they were consistently
given below guideline sentences; one as low
as 18 months.

The Government hasn't raised I think
the obvious distinction which is that there
was no actual sexual contact in those cases,
and I acknowledge that that's a weakness in
my argument.  However, looking for trouble
is also an aggravating factor and the
guidelines only account for sexual contact
in terms of 2 points, though in the way this

1       crime is written up and construed, it still

2       I think warrants a non-guideline sentence on

3       those respects.

4           Finally, I think we'll hear briefly

5       from Mr. Murphy's father, Bruce Mitchell,

6       and then from his aunt, Susan Williams.  And

7       in addition he has several cousins and aunts

8       and uncles and his stepmother in here in

9       support of him today.

10          THE COURT:  Thank you.  They can come

11      up to the podium and make their statement.

12          MR. MITCHELL:  Your Honor, may I

13      approach the bench -- the podium?

14          THE COURT:  Come up to the podium

15      please.

16          MR. MITCHELL:  Honorable Vanessa

17      Bryant, members of the court and all

18      present, I am Nicholas Murphy's father,

19      Bruce S. Mitchell.

20          First, I'd like to apologize to the

21      victim and her family for any harm that he

22      has done.  I love my son, my oldest son.  I

23      assure you that my son is very sorry for

24      what he has done, anyone he has harmed, for

25      the poor decisions he made.  I feel he is

```
1            remorseful, he's ready to accept his
2            punishment for his actions.
3                 THE COURT:  What is he remorseful
4            about?
5                 MR. MITCHELL:  For his actions and
6            causing them harm.
7                 THE COURT:  You said any harm.  What
8            harm does he think he caused?  Does he
9            think, before you heard --
10                MR. MITCHELL:  Emotional harm for the
11           family.
12                THE COURT:  That's what he believes?
13                MR. MITCHELL:  Yes.  Yes, your Honor.
14           He admitted to his wrongdoings and came
15           forward, and that's honorable.
16                THE COURT:  You say he came forward.
17           What do you mean by that?
18                MR. MITCHELL:  He admitted his guilt.
19           He didn't -- well, he was forward in
20           admitting his guilt.  He didn't --
21                THE COURT:  Okay.
22                MR. MITCHELL:  He didn't come forward
23           to a police department and say I did this.
24                Myself, my second wife, are there for
25           his support.  We'll help me every, every --
```

1          the best we can moving forward.  That's all

2          I have to say.

3                  THE COURT:  Thank you very much.

4                  MR. MITCHELL:  Thank you, your Honor.

5                  MR. ERWIN:  Next we'll hear briefly

6          from Susan Mitchell (sic).

7                  THE COURT:  Yes.

8                  MS. WILLIAMS:  I'm sorry.  Okay.

9                  THE COURT:  Take your time.  Take a

10         deep breath.

11                 MS. WILLIAMS:  Your Honor, my name is

12         Susan Murphy Williams.  I'm Nick's deceased

13         mother's sister.

14                 I understand that we are here to impose

15         punishment for a crime that was committed.

16         I'm asking you to consider Nicholas' life as

17         a whole.  I don't know the Nicholas that you

18         spoke of because that's not the Nicholas

19         that I know.  I'm sorry.  I just ask that

20         you consider Nicholas' life as a whole, as

21         he's tried to live it and not just the bad

22         decision that he made.  I don't believe it

23         was his intention to commit a crime, and

24         when he did realize that he did commit the

25         crime he did tell the truth.  He did tell

1     the truth that he did it.  He knows that he

2     did it.  He knows that he was wrong.

3          He's had so much -- he really has had a

4     lot of loss and sadness in his life, but

5     instead of breaking his spirit he set goals

6     and he's tried to live through them and I've

7     seen him grow up to be a -- he really is a

8     thoughtful and he's an honest young man.

9          I know Nick will face his punishment

10    with all the stoicism and demeanor that's

11    he's always shown us, but I just pray that

12    you can give leniency so he can pay for his

13    crime, but he should still be able to be

14    productive and come home to us.

15         In closing, if I may, I just want to

16    say to Nick that no matter what you'll never

17    be alone and we'll always be there for him

18    and we believe in you and we love you.  I'm

19    sorry.  Thank you.

20         THE COURT:  You're welcome.

21         MS. WILLIAMS:  I tried not to cry.

22         MR. ERWIN:  And finally we'll here from

23    Mr. Murphy, my client.

24         THE COURT:  Yes.  Mr. Murphy?

25         THE DEFENDANT:  Your Honor, I have a

1          written statement and I'll try not to read

2          from it the whole time but -- I'd much

3          rather speak.

4               The first thing I would like to do is,

5          if they were here, apologize directly to the

6          victim, her family and everything that I've

7          caused them over these years.  It was never

8          my intention for something like this to even

9          occur.

10          THE COURT:  Something like what to

11          occur?

12          THE DEFENDANT:  Just this whole

13          situation that they've been put through

14          because of actions, from what I heard from

15          the letter, all that's happened in their

16          household and -- it was wrong.

17          THE COURT:  What did you think was

18          going to happen?

19          THE DEFENDANT:  I clearly wasn't

20          thinking at the time, your Honor.  I mean

21          looking in hindsight I can see all the flags

22          now, but in the moment I clearly just wasn't

23          thinking clearly and I just was being stupid

24          and wasn't thinking it through when I did

25          what I did.  But looking back, I can make

1        all the excuses in the world what I did it,

2        why these things happened, but in the end no

3        excuses really matter.  Just what happened

4        happened.  I can't change that.  And

5        regardless of what happens today or whatever

6        the punishment is, I still have to live with

7        myself for the rest of my life knowing what

8        I did, and going from there.

9            Going along with the fact that I have

10       to live with this for the rest of my life

11       that's also the shame that I've brought on

12       myself and the fact that I disappointed my

13       family, the service that I wanted to serve

14       for my life and I shamed the uniform.  I did

15       not live up to the standards that I should

16       have.  I apologize to everyone that looked

17       up to me and saw me as a role model for

18       years, and the fact that I let them down

19       through my actions.

20           In the end I do admit that I was the

21       adult in the situation.  I did have the

22       power to stop it and I didn't, and looking

23       back if I could change things I would, but

24       can't and I don't try to make excuses for

25       it.  I did -- what I did was wrong and I

1    have to live with that.

2         All I can ask for now is hope that the

3    family in time can forgive me for my actions

4    and my family can forgive me for what I've

5    done and all those around me that supported

6    me over the years will forgive me for my

7    actions and hopefully they won't see me in a

8    different light forever and that they can

9    see through it and help -- help me get back

10   on my feet when this is all said and done,

11   because my family and friends that probably

12   has been with me throughout this whole

13   situation, knowing what it was and

14   supporting me every step of way.  And I

15   understand a lot of people don't have that;

16   a lot of people lose everything when

17   something like this comes up, and I

18   appreciate all that.

19        Lastly, I just want the family to know

20   that I am sorry for what I did, and from

21   after hearing the letter and finding out

22   everything that was going on in that

23   household, I can't say that it would have

24   changed things at the moment because of

25   hindsight, but I mean I really am sorry.

1       And if they are from what I heard, afraid
2       about me being -- coming or anything like
3       that, they can rest assured that they're not
4       going to hear from me ever again.  I just
5       want them to know that I'm truly sorry for
6       what I did and that for the victim I hope
7       that this doesn't negatively affect her in
8       the future and that after all this her and
9       her family can move on and have a very happy
10      and successful life and not have to look
11      back at this chapter.  And I'm sorry, your
12      Honor.
13          THE COURT:  You acknowledge that you --
14      told the Army that you expected the state
15      charges to be dropped?
16          THE DEFENDANT:  What was that, ma'am?
17          THE COURT:  Do you acknowledge as
18      stated in the presentence report that you
19      told the military that you expected the
20      state charges to be dropped?
21          THE DEFENDANT:  I never said I expected
22      them to be dropped.
23          THE COURT:  What did you say you
24      expected?
25          (Pause.)

1          THE DEFENDANT:  I think that was just

2     at the onset of the case.  I didn't think

3     that the case would be dropped.  I thought

4     the military would have taken jurisdiction

5     and I would have had to go through the

6     military process at that time.  It wasn't

7     that I thought that the whole case should be

8     dropped.  I was under the impression that

9     the military would have tried the take the

10     jurisdiction being a service member.

11          THE COURT:  But why would they -- I

12     don't know.

13          THE DEFENDANT:  Because I've seen it

14     before when something happens in the state a

15     lot of times the military still will try to

16     take jurisdiction and prosecute though the

17     UCMJ under military court.

18          THE COURT:  Stateside?

19          THE DEFENDANT:  Either state offenses

20     or federal.  A lot of times --

21          THE COURT:  Felon --

22          THE DEFENDANT:  -- the military will

23     take jurisdiction and --

24          THE COURT:  Felony offenses?  I mean --

25          THE DEFENDANT:  There are felony

1          offenses in the military too, yes.  There

2          are this exact charge, the secondary sexual

3          assault charges also in the UCMJ.

4                THE COURT:  What's the secondary sexual

5          assault charge?

6                THE DEFENDANT:  That's what I'm facing

7          through the state right now, the actual sex

8          assault.

9                THE COURT:  So cases of that nature

10          have been taken over by the military in the

11          past to your personal knowledge?

12                THE DEFENDANT:  I would assume because

13          I have heard of the cases being prosecuted,

14          so being a service member I would assume

15          that just because I'm military their victims

16          aren't going to always be other military

17          members, and that fact that they have been

18          prosecuted in the military would lead me to

19          believe that being military that they would

20          have had the jurisdiction.  Now, that's not

21          what ended up happening, but --

22                THE COURT:  Why did you get an

23          honorable discharge?

24                THE DEFENDANT:  While the state was

25          prosecuting the military decided to

1          judiciously prosecute me.  They tried going

2          the administrative route and go through a

3          dishonorable discharge board review.  I went

4          to those legal proceedings and based on the

5          UCMJ there was a clause that has the mistake

6          of fact where if you can articulate and

7          prove your ignorance of the individual's

8          actual age that that was an acceptable

9          defense.  We did have the proof, we had her

10         statement.

11             During the prosecutor's -- one of their

12         witnesses was an Air Force suicide agent

13         that was present during the original

14         interview I have the police when they

15         approached me the first time, and through

16         his testimony he agreed that I had believed

17         that she was 16 based on his years of

18         knowledge and doing interviews.  So that by

19         the end of that case they didn't have legal

20         basis to discharge me and then I ended up

21         honorably separating several months later

22         and then having to sell off my stuff, leave

23         my apartment and come home to continue the

24         state case.

25             THE COURT:  So they analyzed whether

1          you had committed an offense based upon

2          military law, state law or federal law?

3               THE DEFENDANT:  It's still based off of

4          the original charges for the state.

5               THE COURT:  The state law.

6               THE DEFENDANT:  They just take -- they

7          have corresponding military law that

8          corroborates with whatever that state law

9          was, which would have the secondary sexual

10         assault, and that's what they had proceeded

11         with the administrative hearing with, but we

12         were able to use that.

13              THE COURT:  And under military law a

14         16-year-old girl has the capacity to consent

15         to sexual intercourse?

16              THE DEFENDANT:  Yes.  Military and

17         state had that the legal age of consent was

18         16, but in state law for Connecticut it's a

19         -- from my knowledge it's strict liability

20         under the state so no matter what you knew

21         there's no defense.  But the military has a

22         clause in theirs that has that mistake of

23         fact defense.

24              MR. ERWIN:  We tried to pull the

25         military records.  We were unable to get

```
 1          them in this case, but we've been through

 2          this extensively.  We have a former JAG

 3          attorney in my office and our appraisal is

 4          that reasonable belief in the age is an

 5          affirmative defense under military law.  I

 6          can't provide you with a citation but we

 7          went around and around the mulberry bush

 8          trying to understand that.

 9               THE COURT:  And the military was aware

10          that -- I mean she -- okay.

11               MS. GIFFORD:  If it's of any help, your

12          Honor --

13               THE COURT:  Yes.

14               MS. GIFFORD:  -- we did have this

15          similar conversation with members of the

16          military court and they explained it exactly

17          as been said here, that it was the mistake

18          of age defense that was the reason why they

19          did not -- were not successful in getting a

20          dishonorable discharge.

21               THE COURT:  And they didn't consider

22          the Facebook record?

23               MS. GIFFORD:  Well, because of this --

24          no, they did not consider Facebook.  But,

25          your Honor, at that point I'm not 100
```

1      percent sure whether they had access to the

2      full Facebook account.  We obtained it later

3      through a search warrant.  Or actually, I'm

4      sorry, we obtained it later through the

5      victim's consent.

6          THE DEFENDANT:  I know that issue had

7      come up earlier when my lawyer mentioned the

8      Facebook, and I know if that birth date was

9      on that there I was -- I wasn't aware.  On

10     the front page there was never any actual

11     birthday on her profile when I had looked at

12     it when I was on there.  It was just her

13     gender on the left side bar where it has the

14     individual's information.  There was never a

15     birth date present in her profile.

16         THE COURT:  There weren't photographs

17     of her with other people engaged in activity

18     with her family, things of that sort?

19         THE DEFENDANT:  There was only a few

20     photographs from what I remember, your

21     Honor.  It was just mostly of her from what

22     I remember.  A few that were more

23     provocative poses, but never with any other

24     additional people.  And I never really went

25     on the profile too much after originally

1          becoming friends.  We normally would just

2          contact the Messenger.  I wasn't going

3          through her profile constantly.

4               THE COURT:  Well, I'm sure you've

5          learned a lot from this experience.

6               THE DEFENDANT:  Yes, your Honor.

7               THE COURT:  Thank you.

8               THE DEFENDANT:  Thank you.

9               THE COURT:  In determining the

10         appropriate sentence to impose the Court has

11         to apply the 3553 factors, the first of

12         which is the seriousness of the offense.

13         And the victim's statement is indicative of

14         the consequences of this offense, and the

15         Government's description of the offense

16         describes the nature and the

17         characteristics.

18               It is obviously a serious offense.

19         There are few things that society is

20         responsible for to a greater degree than the

21         care and safety of children.  And the victim

22         obviously was a child well below the age of

23         consent and she published that fact; that

24         fact was in the public domain.  It was

25         available to the Defendant.  The Defendant

1       met her on a site which gave him no

2       reasonable expectation that she was over the

3       age of consent and despite having access to

4       information that would have clearly

5       disclosed to him that she was not, he failed

6       to discharge a critical duty, a critical

7       responsibility.

8           The failure to do so is made even more

9       serious in the mind of the Court because Mr.

10      Murphy is in the Armed Forces and he has

11      sworn to defend the United States and its

12      citizens, and instead of doing so he --

13      using the imprimatur of the military, his

14      uniform, the authority that that conveys,

15      the dignity that that conveys, the solidity

16      that that conveys, influenced an underaged

17      female to engage in illicit conduct.

18          Were there only one contact, one point

19      of contact, this would be a very different

20      case.  But it's not.  In fact there were

21      three, and with the second and the third it

22      would have been obvious to any person that

23      this child was below the age of consent and

24      should not have been engaging in any amorous

25      conduct with the Defendant.

1    Given his stature there is no reason

2    whatsoever why he could not have arrived at

3    that home in the evening, the afternoon, the

4    morning, rung the doorbell, introduced

5    himself to the parents of this young woman

6    and gone out with her if he believed in fact

7    she was over the age of consent.

8    The Court believes that Mr. Murphy knew

9    she was under the age of consent because

10   I've heard absolutely nothing to suggest

11   that there was any reason why he would not

12   have presented himself like a gentleman at

13   her home.

14   With that, I can only conclude that Mr.

15   Murphy did in fact intend to do wrong; he

16   did in fact intend to have sex with a minor.

17   And perhaps, Mr. Erwin, your pointing to the

18   tender age at which Mr. Murphy's mother died

19   and his emotional maturity may signal a

20   potential reason why Mr. Murphy was attached

21   to a child of that age.

22   However, Mr. Murphy is an adult.  He is

23   an adult in whom a lot of trust, respect and

24   responsibility has been reposited by the

25   military and certainly he had the ability

1          and the duty to avoid harming this child and

2          to avoid violating the law.

3               The Court must impose a sentence that

4          fosters respect for the law, that protects

5          the public, that deters the Defendant as

6          well as others from engaging in similar

7          criminal conduct.  And the Court must

8          consider the Defendant's educational and

9          vocational needs, medical care and

10         corrective treatment in the most effective

11         manner, as well as the need to avoid

12         unwarranted sentencing disparities.

13              I have never had nor do the guidelines

14         contemplate a case in which the perpetrator

15         is a classical predator, one who intends

16         specifically to identify underage children

17         with whom to engage in illicit conduct.  But

18         this is one of those cases, at least with

19         respect to the second and certainly the

20         third point of contact.

21              The Court has to consider the kinds of

22         sentences available and the statutory

23         sentence in this case is not more than 30

24         years, 5 to lifelong period of supervised

25         release, a $250,000 fine, and a special

1     assessment of $5,100 pursuant to 18 United

2     States Code Section 3041(a)(4), which calls

3     for an enhanced special assessment in a case

4     under Title -- Chapter 144 I believe it is.

5     But that is the statutory citation for the

6     enhanced penalty, subsection (a)(4).

7         The Court must also consider the United

8     States Guidelines and any Congressional

9     amendments.  This offense carries a base

10    offense level of 24, 2 points are added

11    because of the undue influence of a minor, 2

12    additional points were added for the use of

13    a computer, and 2 additional points were

14    added for the commission of a sexual act,

15    the sex act, for an adjusted offense level

16    of 30.  2 points are subtracted for

17    acceptance of responsibility, and if the

18    Government makes a motion for any additional

19    1 level reduction the Court would grant

20    that.

21        MS. GIFFORD:  So moved, your Honor.

22    Thank you.

23        THE COURT:  Thank you.  Resulting in a

24    total offense level of 27.

25        The Defendant has no criminal history

1           points as he has no prior conviction and

2           he's in criminal history category 1.  The

3           guidelines recommend a sentence of 70 to 87

4           months in prison, a 5-year period of

5           supervised release, and a fine of between

6           12,500 and $25,000, as well as any

7           restitution.

8               And I would ask at this point whether

9           the Government is aware of whether there is

10          any restitution to be ordered in this case.

11              MS. GIFFORD:  Your Honor, we've had

12          conversations with the minor victim's mother

13          about her rights as to restitution in

14          particular and she has indicated she

15          understands them and she does not wish to

16          pursue any restitution from the Defendant.

17              THE COURT:  Thank you.

18              As I've indicated the Court finds

19          dubious the Defendant's assertion that he

20          didn't know the victim's age given the

21          information available on her Facebook page

22          and the nature of their interaction

23          together.  The Court has been enlightened as

24          to why the Defendant received an honorable

25          discharge and I think, Mr. Murphy, you

1          should be very -- you're very fortunate and

2          you should be very pleased that you did

3          because I can think of few ways in which a

4          serviceman could dishonor his uniform than

5          to engage in sexual conduct with an

6          underaged minor.

7                 Taking into consideration all of the

8          3553 factors and the Defendant's military

9          service which is standard, certainly not

10         distinctive in any respect whatsoever, and

11         as I said I think he's fortunate to have

12         gotten an honorable as opposed to a

13         dishonorable discharge under the facts of

14         this case which obviously were not fully

15         known to the military, although we all know

16         from the media that the military has a

17         rather lax attitude about the sanctity of a

18         woman's body.

19                The Court finds that the following

20         sentence is sufficient but not greater than

21         necessary to fulfill the purposes of

22         sentencing.

23                You are hereby committed to the care

24         and custody of the Bureau of Prisons for a

25         period of 60 months to be followed by a 5-

1           year period of supervised release.  The

2           Court orders you to pay as special

3           assessment of $5,100 and to pay rest -- I'm

4           sorry, not restitution, and to pay a fine of

5           $5,000 to be paid at sentencing or during

6           the period of supervised release.

7                The Court imposes the following

8           mandatory conditions of supervised release,

9           the first being that you may not commit any

10          state, federal or local offense.

11               You may not illegally use or possess

12          any controlled substance.

13               You are to pay your special assessment

14          and your fine during the of supervised

15          release.

16               You are to register as a sex offender

17          and cooperate with the collection of your

18          DNA sample.

19               The Court imposes the following special

20          conditions of supervised release, the first

21          of which is you shall be subject to random

22          urinalysis, the first to be within 15 days

23          of your date of release and at least two

24          times thereafter.

25               You may not use alcohol to excess.

1         Your home, your person, your vehicle,

2     your place of employment, any photographic

3     equipment and any electronic equipment which

4     you own or to which you have access shall be

5     subject to search by the Probation Office

6     and/or law enforcement, and any photographic

7     devices or electronic devices are subject to

8     monitoring by the Office of Probation.  Any

9     interference with search and/or monitoring

10     constitute a violation of the conditions of

11     supervised release which will subject you to

12     the potential for an additional period of

13     incarceration.

14         You shall comply with all state,

15     federal and local sex offender registration

16     requirements.

17         You are to participate in both mental

18     health and substance abuse evaluations and

19     treatment at the direction of the Office of

20     Probation on an outpatient basis and on an

21     inpatient basis if so ordered by the Court.

22         You are not to be in the presence of

23     any children under the age of 18 unless you

24     are accompanied by an adult over the age of

25     21 known to you as a fact who has knowledge

1    or your conduct or conviction and the risk

2    that you pose.

3    You shall provide financial records to

4    the Office of Probation as directed.

5    You may not loiter in an area where are

6    children are known to frequent.  That's for

7    example schools, playgrounds, recreational

8    centers, places of that sort.

9    You may not have contact with sex

10   offenders, meaning anyone known to you as

11   having committed any sex offense, including

12   in particular anyone on a sex offender

13   register.  And your intentional ignorance of

14   such facts will not shield you from the

15   violation of the conditions of supervised

16   release.  Sex offender registries are public

17   and you are charged with knowledge of what

18   is on a registry, just as you were charged

19   with the knowledge of what's on the Facebook

20   profile page of an individual with whom you

21   are involved intimately.

22   You may not be employed, you may not

23   volunteer and you may not engage in other

24   activities with organizations involving

25   children.  And the Probation Office may give

1    notice to any third party of the risk that

2    you pose at their discretion.

3        Those are the conditions to which you

4    will be subject during the period of

5    supervised release.  Your violation of any

6    of those conditions, including your

7    interference with the implementation of any

8    of those conditions will constitute a

9    violation.

10       Yes, Attorney Gifford?

11       MS. GIFFORD:  Thank you, your Honor.

12   It just occurs that the minor victim after a

13   term of 60 months may be of majority age

14   wouldn't fall under the conditions as

15   expressed.  Would the Court be willing to

16   add a condition of no contact direct or

17   indirect with the minor victim and/or her

18   family members?

19       THE COURT:  Yes.

20       MS. GIFFORD:  Thank you, your Honor.

21       THE COURT:  You are to have no contact

22   with the victim or any member of her family

23   through any means whatsoever, electronic,

24   personal, written communication, letter,

25   telephone.  No contact whatsoever with the

1　　　　　　victim or any member of her family.

2　　　　　　　　Now, is there any objection to the

3　　　　　　sentence as imposed?

4　　　　　　　　THE COURT:  None from the Government,

5　　　　　　your Honor.

6　　　　　　　　MR. ERWIN:  None from the Defense, your

7　　　　　　Honor.

8　　　　　　　　THE COURT:  Are there any requests?

9　　　　　　　　MR. ERWIN:  No, your Honor.  Oh, excuse

10　　　　　　me.  We had a joint request I think with the

11　　　　　　Government that I neglected to mention

12　　　　　　earlier --

13　　　　　　　　THE COURT:  Yes.

14　　　　　　　　MR. ERWIN:  -- with respect to this

15　　　　　　case sentencing.  Prior to yesterday or last

16　　　　　　week Mr. Murphy was scheduled to have his

17　　　　　　state sentence imposed in the Superior Court

18　　　　　　in Danielson this Friday.

19　　　　　　　　THE COURT:  Yes.

20　　　　　　　　MR. ERWIN:  Yes.  We mutually heard

21　　　　　　from the Attorney Slitt, the prosecutor over

22　　　　　　there who was in the Army, he was called up

23　　　　　　in response to the hurricane efforts, he is

24　　　　　　unable to be there for the sentencing, so we

25　　　　　　are probably going to be getting a later

1    date.  I know the Court does not have power

2    over the BOP, so I think we were both hoping

3    that it would ask that the Marshals Office

4    consider holding him in a facility nearby so

5    that when the state habeas' him in it will

6    impose as little administrative burden as

7    possible.

8         THE COURT:  Yes.  The Court recommends

9    that the Defendant be housed in a facility

10    as close to Danielson, Connecticut as

11    possible and the Court notes that the

12    sentence imposed is to be concurrent with

13    any state sentence.

14         MR. ERWIN:  Thank you.

15         THE COURT:  You're welcome.

16         Now, Mr. Murphy, I advise you that

17    should you choose to appeal the sentence

18    imposed by the Court you have to do so

19    within 14 days of the date of the written

20    judgment which will probably be signed by

21    this Friday, so you can begin counting from

22    there.  You can to do that by contacting

23    your attorney.  If you're no longer

24    represented by Attorney Erwin you're

25    entitled to be represented by counsel.  If

1          you can't afford an attorney, an attorney

2          will be appointed to represent you.

3               In addition, should you choose to

4          appeal you have to do so within the 14 days,

5          so if you're either not represented by

6          Attorney Erwin or he chooses not to file an

7          appeal on your behalf, you can contact the

8          Clerk of the Court to get the papers with

9          which to file an appeal.  However, it has to

10         be done within 14 days of the written

11         judgment.

12              Now, I'm advising you of that not

13         because I believe that there is any basis to

14         appeal.  I think you've been aptly

15         represented by your attorney; you've gotten

16         a very favorable disposition to your case

17         all things considered.  But I am required by

18         law to tell you the deadline so that should

19         you choose to do so you are not foreclosed

20         because you failed to do so timely.

21              Do you understand?

22              THE DEFENDANT:  Yes, your Honor.

23              THE COURT:  Okay.  Are there any

24         questions or other matters to --

25              MS. GIFFER:  I'm sorry, your Honor, but

```
 1          just one quick housekeeping matter.  I
 2          believe when the Defendant was speaking he
 3          inadvertently mentioned the minor's first
 4          name, and I was wondering what the Court's
 5          procedure is for that, if it could be
 6          deleted from the transcript or redacted to a
 7          first initial.
 8              THE COURT:  The name is to be redacted
 9          in whole from the transcript and replaced
10          with the word victim.
11              MS. GIFFORD:  Thank you, your Honor.
12              THE COURT:  You're welcome.
13              Anything further from the defense?
14              MR. ERWIN:  Nothing further, your
15          Honor.
16              THE COURT:  All right.  Thank you.
17              (Proceedings adjourned at 2:03 p.m.)
18
19
20
21
22
23
24
25
```

1          <u>CERTIFICATE</u>

2

3          I hereby certify that the foregoing 54

4    pages are a complete and accurate transcription to the

5    best of my ability of the electronic recording of the

6    Sentencing Hearing in re:  UNITED STATES OF AMERICA

7    vs. NICHOLAS MURPHY, Criminal No. 3:16-CR-00227 (VLB)

8    held before The Hon. Vanessa L. Bryant, United States

9    District Judge, in Hartford, Connecticut, on September

10   13, 2017.

11

_Suzanne Benoit_

12   _____

13   Suzanne Benoit, Transcriber          Date: 1/6/18

14

15

16

17

18

19

20

21

22

23